## Slotsky v. Gellar

*Richard Rosenbleeth,* for plaintiff.
*Ralph Schwartz,* for defendants.

GOLD, P. J., December 22, 1969.—

## I. PLEADINGS AND ISSUES

This is an action under the Business Corporation Law based upon a deadlock between plaintiff (Slotsky) and defendant (Gellar) who are equal shareholders of the issued capital stock of Penn Radio Cab, Inc. (corporation).

The complaint alleges, in brief, that disagreements have taken place between Gellar and Slotsky based upon Gellar's actions taken in violation of a certain contract between the parties dated October 18, 1965, under the terms of which Gellar should operate corporation as an employe, and the control of corporation and establishment of policy in all major decisions shall be by unanimous vote of Gellar and Slotsky.

The complaint requested the court to order the removal of Gellar as operating head of corporation and to appoint a custodian to carry on the business of corporation.

An answer was filed averring, in essence, that Gellar was managing corporation properly in accordance with the agreement; that the differences between Gellar and Slotsky were minor in nature; and that there was no need for the appointment of a custodian. This is the sole issue in this case.

## II. HISTORY OF THE CASE

Corporation is a Pennsylvania corporation engaged in the taxicab business at 529-35 Sedgwick Street,

Philadelphia, Pa. Prior to the incorporation, the business had been run as an individual undertaking by Gellar. He became involved in serious financial difficulties, as a result of which it became necessary to borrow moneys or seek a new investor. The new investor was plaintiff Slotsky.

The articles of incorporation approved August 31, 1965, provided for a capitalization of 10,000 shares of common stock having a par value of $1 per share. Gellar and Slotsky subscribed for 500 shares each of the common stock, and accordingly 500 shares were issued to Slotsky and 500 shares to Gellar.

At the initial meeting, four directors were chosen, namely, Gellar, Ralph Schwartz, Esq., his nominee; Slotsky and Reuben Miller, Esq., his nominee. Slotsky was named as president, and Gellar was named as secretary-treasurer of corporation.

Accordingly, Gellar functioned as the operating head of corporation. His wife, Kate Gellar, was employed as a dispatcher.

Admittedly, the parties never held a meeting of the board of directors or of the shareholders of corporation; no bylaws were adopted by corporation and no minutes were ever recorded of either a meeting of the shareholders or of the board of directors or of weekly informal meetings held by Slotsky and Gellar.

After February 22, 1969, the weekly conferences between Slotsky and Gellar were discontinued and the parties did not communicate with each other on any regular basis about corporation's affairs. Instead, there was acute disagreement leading to bitterness and acrimony.

There were various causes of contention between the parties. Among Slotsky's contentions were: Gellar refused to hold their informal meetings once a week as heretofore; he failed to deposit drivers' receipts promptly after receipt thereof; he used corporation's

funds for his own purposes; he declared unilaterally salary increases and bonuses for himself; he failed to follow a proper policy of replacement and repair of taxicabs; he failed to initiate and follow a safety program which would result in the reduction of accidents and accordingly reduce the liability insurance rates of corporation; he discharged an employe who was partial to Slotsky and refused to discharge an employe who had threatened to, and actually did, assault Slotsky.

There were other causes of contention. Corporation's garage had been purchased by Slotsky's sister, Sarah S. Master, and leased to corporation on July 1, 1966 under the terms of which lease the landlord was to receive a net rent of $200 monthly. All other expenses were to be paid by corporation. The lease provided that, upon 45 days notice, corporation had to repurchase the same from Mrs. Master for the sum of $30,000. On March 19, 1969, corporation received notice from Mrs. Master insisting that corporation honor its obligation under this clause of the lease. Corporation was in no position to borrow the funds necessary without the personal signature of Slotsky, which he refused to give. Thus, there is a default in the lease which could possibly lead to serious consequences.

There were other serious problems and no effort was made jointly to solve them. The neighbors had started an action in equity to restrain corporation from using the garage in violation of a deed restriction upon the property. Slotsky alleged that it was Gellar's improper use of the garage which could possibly cause the entire loss of their investment should the neighbors be successful in the litigation now pending. As of the time of this trial, a certificate of readiness had not been filed and it is extremely doubtful whether the case will be tried in the near future.

Among other problems were the restiveness of the taxicab drivers of corporation because of lack of recognition of a union they had created and also because corporation had failed to repair the roof on the garage which condition was allegedly in violation of the Philadelphia Code of Ordinances.

Among Gellar's complaints against Slotsky were: He was intent on getting sole control of corporation.

Prior to the institution of this complaint, the relationship between Slotsky and the Gellars had deteriorated to the point where the Gellars instituted an action in equity to enjoin Slotsky from selling the Gellars' stock in corporation which was held by Slotsky as collateral security for the repayment to him of a loan of $22,500. The matter was heard before Judge Sloane. Somehow the Gellars were able to borrow the needed funds to repay Slotsky and thereafter Slotsky returned the 500 shares which he had previously held as collateral.

Gellar maintains that Slotsky is using his sister, Mrs. Master, as a ploy to wreck and ruin corporation; that he had tried to enlist the loyalty of key employes with promises of reward should he, Slotsky, get control of corporation.

### III. FINDINGS OF FACT

1. Corporation is a Pennsylvania corporation having its principal place of business at 529-35 W. Sedgwick Street, Philadelphia, Pa., and is engaged in the taxicab business.

2. Corporation has issued 1,000 shares of its authorized shares of common stock. Slotsky is the owner of 500 shares and Gellar is the owner of the other 500 shares.

3. The directors of corporation are Slotsky, Gellar, Ralph Schwartz, Esq., and Reuben Miller, Esq., the latter two being the nominees of Slotsky and Gellar.

4. Slotsky is the president of corporation and Gellar is the secretary-treasurer.

5. Since its inception in 1965, corporation has never had a board of directors' or stockholders' meeting.

6. Slotsky, as president, has never called a meeting of either the board of directors or of the stockholders.

7. No bylaws have ever been adopted by Corporation.

8. No term has been specified for the officers of corporation or of the directors of corporation.

9. No minutes were ever kept of the informal meetings between Slotsky and Gellar.

10. Paragraph 10 of a shareholders' agreement dated October 18, 1965, between Slotsky and Gellar provides:

". . . the operation of the company shall be in Gellar as an employee, and the control of the company and establishment of policy in all major decisions shall be by unanimous vote of Gellar and Slotsky."

11. The agreement of October 18, 1965, provides for no specific term or duration.

12. Until February 22, 1969, the affairs of corporation were managed on an informal basis by Slotsky and Gellar by way of weekly conferences between Slotsky and Gellar.

13. Since February 22, 1969, Slotsky and Gellar have not had weekly conferences and have not communicated with each other on any regular basis about corporation's affairs.

14. Gellar spends, on the average, 8 to 10 hours a day, 7 days a week, in the management of said business.

15. The Gellars enjoy an excellent relationship with their cab drivers.

16. The corporation, under Gellar's management, has shown consistent progress and increase in business as follows:

| Fiscal Year | Gross Income | Net Profit |
|:-----------:|:------------:|:----------:|
| 3/1/67 | $278,631 | $22,864 |
| 3/1/68 | $426,730 | $40,200 |
| 3/1/69 | $557,357 | $32,064 |

17. As a result of obtaining a new insurance carrier, at lower rates, the net profit for the fiscal year ending March 1, 1970, should be increased by approximately $10,000.

18. Both Slotsky and Gellar have been receiving an equal share of the net profits as follows:

> 1967 $11,432 each
> 1968 $20,100 each
> 1969 $16,032 each

19. Slotsky has requested Gellar to resign as operating head of the corporation and Gellar has refused to do so.

20. Slotsky and Gellar are in dispute as to Gellar's methods of operating corporation and Gellar refused to recognize requests by Slotsky as to changes in the methods of operating corporation, resulting in other insoluble disputes between Slotsky and Gellar.

21. The areas of dispute between Slotsky and Gellar as to control and/or policy are as follows:

(a) Gellar's failure to deposit drivers' receipts promptly after receipt, his use of corporation funds for his own purposes and unilateral declarations of salary increases and bonuses for himself.

(b) Gellar's use of corporation's assets for his own personal profit.

(c) Gellar's failure and refusal to agree to and follow a policy of proper replacement and repair of corporation's cabs.

(d) Gellar's refusal to follow a program to reduce accidents which would result in a reduction of liability insurance rates.

(e) Gellar's discharge of a valuable employe because he aided Slotsky in this litigation and his refusal to discharge an employe who has threatened and assaulted Slotsky.

22. The relationship between Slotsky and Gellar has deteriorated to a point where:

(a) The Gellars instituted an action in equity to enjoin Slotsky from selling Gellar's stock in corporation held by Slotsky as collateral due to a default in repayment of a loan by Slotsky to Gellar.

(b) Gellar has attempted to physically assault Slotsky and has threatened him with physical violence.

(c) A corporation employe barred Slotsky from viewing corporation's records at Gellar's direction, except at times as directed by Gellar, and the employe assaulted Slotsky in the course of preventing him from reviewing the records.

23. Notice has been received from Sarah Masters, the landlord, by letter dated March 21, 1969, insisting that the corporation honor its obligation under the lease to purchase the garage for the sum of $30,000, but due to the disputes, the acrimony and the lack of cooperation between Slotsky and Gellar, corporation cannot finance the purchase of the property where it conducts its business, as a result of which corporation is in default under the lease.

24. An action in equity has been instituted by the neighboring property owners to enjoin corporation's use and operation of the garage for alleged violations of deed restrictions. The matter is pending in the courts of Philadelphia County. No certificate of readiness has been filed as of this moment.

25. Gellar recently began negotiations for the purchase of new cabs without communicating with Slotsky in violation of paragraph 10 of the shareholders' agreement.

26. Gellar recently began negotiations with the

labor union representing corporation's drivers without communicating with Slotsky in violation of paragraph 10 of the shareholders' agreement.

27. Slotsky has given notice to Gellar that if a custodian is not appointed by this court, he intends to participate as president in the operation of corporation on a full-time basis, and in such manner as will not contravene paragraph 10 of the agreement of October 18, 1965, all of which undoubtedly will lead to more bitterness and acrimony between Slotsky and Gellar.

28. It would be futile for Slotsky or Gellar to call for a meeting of the board of directors, because obviously such meeting would result in a deadlock.

29. It would be futile for Slotsky or Gellar to call for a meeting of the shareholders, because obviously such meeting would result in a deadlock.

30. Establishment of policy in all major decisions has not been made by unanimous vote of Gellar and Slotsky.

## IV. DISCUSSION

Prior to the adoption of Section 513.1 of the Business Corporation Law in 1968, this court would have had no jurisdiction to appoint a custodian to continue the operation of the business. Its sole function in a given case where the directors were deadlocked in the management of the corporate affairs, and the shareholders were unable to break the deadlock, and where irreparable injury to the corporation is being suffered or is threatened by reason thereof, would be to appoint a receiver to liquidate the business.

Under section 513.1 above stated:

"A. The court of common pleas of the county in which the registered office of a business corporation is located, upon application of any shareholder, may appoint one or more persons to be custodians of and

for any business corporation when it is made to appear:

"(1) That at any meeting for the election of directors the shareholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon the qualification of their successors; or

"(2) That any of the conditions specified in subsection A of section 1107 of this act exists with respect to the corporation.

"B. A custodian appointed under this section shall have all the power and title of a receiver appointed under Article XI of this act, but the authority of the custodian shall be to continue the business of the corporation and not liquidate its affairs and distribute its assets, except when the court shall otherwise order and except in cases arising under clause (2) of subsection A of section 383, or clauses (1) through (3) of subsection A of section 1107 of this act."

It will be noted that section 513.1 includes as grounds for the appointment of a custodian those situations referred to in subsection A of section 1107 of the Business Corporation Law. Reviewing section 1107A, 15 PS §2107, we find subsection 4 thereof, which provides the following as grounds for the appointment of a custodian:

"That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof."

To repeat, therefore, a custodian can be appointed by this court only under two circumstances. One is directly under section 513.1A (Numeral 1), which provides:

". . . that at any meeting for the election of directors the shareholders are so divided that they have

failed to elect successors to directors whose terms have expired or would have expired upon the qualification of their successors; . . ."

The second is subsection 4 of section 1107A, which we have quoted above.

The question is necessarily raised, therefore, as to whether these sections apply in an instance such as we have here where there has never been a meeting of the board of directors nor of the shareholders of corporation.

The problem could have been obviated had Slotsky, under his attorney's direction, issued a call for a meeting of the board of directors and of the shareholders prior to or even during the pendency of this action. But he has failed to do so. This court will take jurisdiction despite this failure for the reason that the law does not call upon a person to make a futile gesture or to take action which is condemned to futility. Obviously, if prior to or pending this litigation a meeting of the board of directors or the shareholders had been called, there would have been a deadlock. Considering the history of this case and the acrimony which now exists, this conclusion is inescapable.

Equity does not compel the performance of a vain and useless act (Commonwealth Title Insurance & Trust Company v. Seltzer, 227 Pa. 410 (1910) ) or an "idle ceremony": Maxwell v. Enterprise Wall Paper Mfg. Co., 47 F. Supp. 999 (E.D. Pa., 1942), 131 F. 2d 400 (3rd Cir., 1942) (reversed on other grounds).

We, therefore, conclude that this court has the power to appoint a custodian in accordance with section 513.1 of the Business Corporation Law.

The key question is whether this court should appoint a custodian. To aid us in this determination, we look to the authorities to ascertain whether section 513.1 has been construed by any court in Pennsylvania. We find no decisional authority to aid us in our determination.

We therefore look back to section 1107A to ascertain how the Pennsylvania courts have construed the question of deadlock among a board of directors and shareholders in the context of appointing a receiver for a business corporation. Illustrative cases are Bowman v. Gum, Incorporated, 321 Pa. 516 (1936); Schipper Bros. Coal Mining Co. v. Economy Domestic Coal Co., 277 Pa. 356 (1923); Garrett v. George K. Garrett Co., Inc., 39 D. & C. 179 (1940).

For example, in Bowman v. Gum, supra, the court stated that the deadlock of directors and shareholders concerning the purchase of raw materials and payment of a certain indebtedness was a case within the terms and meaning of section 1107A of the Business Corporation Law.

As we have indicated, Slotsky and Gellar are poles apart with reference to Gellar's function as operating head of corporation, and there is not the slightest chance of reconciliation of their views with respect to the control of the company and the establishment of policy in all major decisions by unanimous vote of Gellar and Slotsky.

We have already referred to major matters which the parties are not resolving. Just to repeat a few, the following matters certainly need joint cooperation: The safety program; the reduction of liability insurance; the handling of deposits and receipts; the alleged default on the part of the corporation to honor the notice from Mrs. Master to repurchase the garage from her; the litigation instituted by the neighbors. We can mention many more, but suffice it to say here that they are included in the findings of fact and are incorporated herein by reference thereto.

It is unfortunate that the parties cannot see eye to eye on even the simplest of matters. It is very unfortunate that the situation has deteriorated to the present impasse because, in truth and in fact, the business

is prospering. In a period of three years, its gross income has risen from $278,631 to $557,357; its net profit has correspondingly grown from $22,864 to $32,064. According to the testimony, the latter figure would have been much greater had it not been necessary to pay an extraordinary insurance premium of $43,000. Reducing it to its minimum, the prospects of this taxicab company are excellent. We would be inclined to disallow and refuse the petition for the appointment of a custodian, but we do not operate with a crystal ball nor are we clairvoyant. We do not know what the future will hold for corporation. All we do know is that the parties who own the equity interest in this corporation cannot cooperate with each other, as a result of which there is called into play the invocation of Section 513.1 of the Business Corporation Law. This court is reluctant to appoint a custodian; yet, at the same time, it faces the obvious fact that there is such a genuine and complete antipathy between Slotsky and Gellar that, in fact, irreparable injury to corporation is being suffered and is being threatened by reason of the deadlock between the parties.

Our determination to appoint a custodian is strengthened by certain omissions in the agreement of October 18, 1965. For reasons unexplained to this court, the parties failed to specify a term or duration of the agreement. They failed to specify the term of office of the directors and officers. They did not set forth any condition for a situation which could lead to an amicable severance of the relationship between Slotsky and Gellar, nor does the agreement contain any buy and sell provision. It does not set forth any guidelines in the event that the relationship between the two equity owners deteriorates, as indeed it did in this case. Under these circumstances, since the agreement provides no way of aiding the parties to

solve their problems should there be a stalemate or deadlock, we must utilize the law which makes such a remedy available.

## V. CONCLUSIONS OF LAW

1. This court has jurisdiction over all parties hereto and the subject matter of this litigation.

2. It would be a futile act for Slotsky or Gellar to issue a call for a meeting of the board of directors or of the shareholders of corporation, it being apparent that there is a deadlock between Gellar and Slotsky which cannot be broken.

3. The directors of corporation, Gellar, Ralph Schwartz, Esq., Reuben Miller, Esq., and Slotsky, are deadlocked in the management of corporation's affairs, and the shareholders, namely, Gellar and Slotsky, are unable to break the deadlock, and that irreparable injury to corporation is being suffered and is being threatened by reason thereof.

4. The Act of July 20, 1968, no. 216, otherwise designated as section 513.1 of the Business Corporation Law, 15 PS §1513.1 applies to and controls this litigation.

5. The appointment of a custodian to operate the affairs of corporation is necessary to prevent irreparable injury to corporation.

## VI. DECREE NISI

And now, December 22, 1969, the court orders and decrees as follows:

1. A custodian shall be appointed by this court to continue the business of corporation to prevent irreparable injury to corporation.

2. This decree nisi shall become final unless exceptions are taken to the same within 20 days hereof; and thereafter, in the event that said exceptions are dismissed by this court or a court en banc, as may be requested by defendants.

3. Each party hereto shall pay its own costs.